UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **HYDRADYNE HYDRAULICS, INC.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 05-1684** |
| **THE GATES RUBBER COMPANY and GATES CORPORATION** | **SECTION "K" (2)** |

### ORDER AND REASONS

Before the Court are defendants' The Gates Rubber Company and Gates Corporation ("Gates") Motion for Summary Judgment (Rec. Doc. No. 4). Having reviewed the pleadings, memoranda, and relevant law, as well as having heard oral argument on December 1, 2005, the Court **DENIES** defendants' Motion for the following reasons.

**I.    Facts**

In August of 1983, Gates and plaintiff Hydradyne Hydraulics, Inc. ("Hydradyne") entered into an "Industrial Hose Warehouse Distributor Contract" ("the Contract"). *See* Rec. Doc. No. 4, Exh. A.   In it Hydradyne, as Distributor, agreed to sell and distribute Gates' industrial rubber products. Specifically the contract language states that Hydradyne, as Distributor "agrees to give preferred and special attention to the selling of the above-named Industrial Rubber Product(s). The Distributor agrees to carry a representative stock of these Gates Industrial Rubber Product(s) so that

he is prepared to give prompt service on orders." *See* Rec. Doc. No. 4, Exh. A  Although not stated in the contract, the rubber products contemplated by the contract consisted of "high pressure hydraulic fluid power hoses used to transfer high pressure fluids to mobile equipment." *See* Gates' Statement of Uncontested Material Facts, No. 4.

The Contract continues, including a provision whereby "the Distributor agrees to buy immediately an assortment of these Gates Industrial Rubber Product(s) to bring his stock up to the required minimum.  The Distributor may select the sizes and quantities he desires that will take care of his service requirements.  It is understood, however, that the assortment must cover a representative range of sizes adequate for his trade area."  According to plaintiff and supported by Gates' own product literature, different sized hoses necessarily require different sized couplings, a stock of which the contract contemplated that plaintiff would maintain.  *See* Rec. Doc. No. 4, Exh.C.

Finally, the Contract also contains a provision that "either party may terminate this contract at any time during its original term or any extension thereof with not less than thirty (30) days written notice to the other party."  *See* Rec. Doc. No. 4, Exh. A.  On October 5, 2004 Gates sent Hydradyne a letter terminating the Contract pursuant to these terms and stating that the Contract between the two parties would be terminated thirty days after Hydradyne's receipt of the letter.  *See* Rec. Doc. No. 4, Exh. B.  The letter provided no reason for Gates's termination of the Contract and did not allege that Hydradyne was in default of any provision of the Contract.  Gates has since refused to accept the return of the hoses and couplings that were in Hydradyne's inventory at the time of termination, and Gates has also refused to reimburse Hydradyne for the cost of these hoses and couplings.  Furthermore Gates has allegedly failed to pay Hydradyne the sum of $10,824.26, the amount of a credit owed to Hydradyne by Gates pursuant to Gates' Customer Statement dated

August 2005. Hydradyne filed suit against Gates in Jefferson Parish Court on March 28, 2005 alleging violations of the Louisiana Repurchase of Farm, Industrial and Lawn and Garden Equipment by Wholesaler Act ("Repurchase Act"), La. R.S. 51:481. *et seq.* Hydradyne alleges that because the distributor contract is governed by the terms of the Repurchase Act, Gates is required to repurchase the stock of its hoses and couplings left in Hydradyne's inventory, as well as pay for all related shipping and transportation costs associated with the repurchase. *See* Rec. Doc. 1, Complaint, Paragraph 8. Hydradyne also alleges Gates has breached the obligation of good faith inherent in the Contract by unilaterally terminating the Contract in a manner that caused economic damage to Hydradyne. Id. at para. 9. On November 23, 2005, Hydradyne filed a First Supplemental and Amending Complaint (Rec. Doc. No. 16) in which it added a claim for $10,824.26, the amount of a credit owed to Hydradyne by Gates pursuant to Gates' Customer Statement. *See* Rec. Doc. 16, Amended Complaint, Paragraph 10.

On May 5, 2005 Gates filed a Notice of Removal with this Court based on diversity jurisdiction. Gates filed the instant Motion for Summary Judgment (Rec. Doc. No. 4) on August 1, 2005 on grounds that the products which were the subject of the Contract between Gates and Hydradyne do not fall within the limited groups of products to which the Repurchase Act applies because 1) the products are not used in the fields of farming, construction, heavy industrial material handling, utility or lawn and garden and 2) the products do not qualify as equipment, engines, implements, machinery or attachments. Thus, the termination procedures and penalties for violating the Repurchase Act are inapplicable, and Gates' termination of the Contract and failure to repurchase inventory from Hydradyne was not wrongful. In short, Gates moves now for summary judgment by arguing that Hydradyne cannot prove that the Repurchase Act governs the Gates

3

products sold by Hydradyne under the Contract, and as such, Hydradyne is not entitled to any monetary relief nor buyback of its inventory from Gates.

Hydradyne responds that the provisions of the Repurchase Act are completely applicable, because the products which were the subject of the Contract were indeed used in the fields of farming, construction, heavy industrial material handling, utility, or lawn and garden, as required by the terms of the Act. Hydradyne avers that not only were the Gates products sold by Hydradyne pursuant to the Contract sold to customers in a variety of industries, including construction , but also that the products themselves qualify as attachments under the Act because they are high pressure hoses that by definition must be "attached" to other equipment. As to Gates' argument that it does not manufacture any of the equipment to which any of its hoses may be attached for use, Hydradyne contends that it is the actual Gates hoses themselves that are the attachments covered by the Repurchase Act. Hydradyne states that the hose couplings manufactured by Gates and sold by Hydradyne qualify as the replacement or spare parts also contemplated by the Act. In support Hydradyne points out that Gates' hose cannot be used without Gates' couplings and that Gates' couplings cannot be used without Gates' hose.

In sum, Hydradyne argues that just like the situation contemplated by the Repurchase Act, Hydradyne maintained not only a stock for sale of different-sized couplings necessary to attach the Gates' hose, but also sold and maintained a stock of the hose itself. Now, as a result of Gates' unilateral termination of the Contract, and contrary to the purposes of the Act, Hydradyne is left "holding the bag" because they have no ability to sell either the hose nor the couplings left in their inventory.

## II.     Legal Standard

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the burden shifts to the non-movant "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. "[M]ere allegations or denials" will not defeat a well-supported motion for summary judgment. Fed. R. Civ. P. 56(e). Rather, the non-movant must come forward with "specific facts" that establish an issue for trial. *Id.*

When deciding a motion for summary judgment, the Court must avoid a "trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are tasks for the trier-of-fact. *Anderson*, 477 U.S. at 255. To that end, the Court must resolve disputes over material facts in the non-movant's favor. "The party opposing a motion

5

for summary judgment, with evidence competent under Rule 56, is to be believed." *Leonard v. Dixie Well Service & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir. 1987).

### **III.** **Analysis**

The applicability of the Repurchase act is defined in La. R.S. 51:481(A) which states:

A. The provisions of this Part shall apply to written contracts or oral agreements of definite or indefinite duration between [a.] any person, firm, or corporation engaged in the business of selling, distributing or retailing [1] farm, [2] construction, [3] heavy industrial material handling, [4] utility and [5] lawn and garden [i] equipment, [ii] engines, [iii] implements, [iv] machinery, [v] attachments and repair parts for such equipment and [b.] any wholesaler, manufacturer, or distributor of such equipment and repair parts, whereby the retailer agrees with the wholesaler, manufacturer, or distributor to maintain a stock of such [x] parts, or [y] complete equipment or machines, or [z] attachments. La. R.S. 51:481(A) (numbering taken from *Lake Charles Diesel, Inc. v. General Motors Corp.,et al.*, 328 F.3d 192 (5th Cir. 2003)).

As was stated by the Fifth Circuit, and as was made clear during oral argument on December 1, 2005 and by the Court's own intensive study of the Act, interpretation of this applicability clause is no easy task. *See Lake Charles Diesel*, 328 F.3d at 199 ("For reasons known only to the drafters of this legislation, *every* delimiting feature of the types of contracts and agreements to which the Repurchase Act applies is contained in this one, 91-word, 14-comma, seemingly interminable, sentence."). Fortunately the Fifth Circuit has already done most of the parsing, resulting in "an unambiguous catalog of *every feature* that a contract *must* have if the Repurchase Act is to apply. *Id.*(emphasis added).

Essentially, there must be a contract between a dealer (defined in §481B(3) as being in the business of selling, distributing or retailing) and an agent (defined in §481B(4) as being in the business of wholesaling, manufacturing, or distributing) to sell, distribute or retail tangible movable (personal) property that must pertain to one or more of five *exclusive* industries: farming,

construction, heavy industrial material handling, utility, or lawn and garden. *Id*. at 200. Additionally, even if one of the five specific industries is involved, the property being sold must also be of one or more of five types: equipment, engines, implements, machinery, and/or attachments. *Id.* Finally, a third condition must be met, namely the "dealer must also agree to sell, distribute, or retail, and the agent must also agree to wholesale, manufacture, or distribute," repair parts for the property and "in the dealership contract" the dealer must agree to "maintain a stock [inventory]" of either repair parts for the property or the property itself or the attachments for such property. *Id.*

Restated, §481(A) "requires a contract to have two key characteristics if the Repurchase Act is to be applicable: (1) the contract must *establish a dealership* that sells, distributes or retails the kind or kinds of (a) equipment *and* (b) repair parts that are identified in the statute; and (2) in the contract, the Dealer must agree to maintain an inventory of (a) such equipment *or* (b) such parts, *or* (c) both." *Id.* at 201. Notably the requirement that the dealer maintain some sort of stock *inventory*–be it of repair parts for the property or the property itself–*must* be explicit in the contract language. *Id.* However, as to repair parts, the agreement to sell, distribute, or retail them does not need to be in the contract itself; apparently it just needs to be understood [and occur] between the parties. *Id.* "In sum, §481(A) cannot be read to make the Repurchase Act applicable to a contract that establishes only a freestanding dealership in repair parts." *Id.* Consequently, the Repurchase Act will apply where a Dealer sells an Agent's equipment and repair parts *and*, as explicitly stated in the contract, maintains of inventory of the equipment only, an inventory of the repair parts only, or an inventory of both.[1] The Repurchase Act will not apply to situations where a dealer sells *only*

---

[1] All of these scenarios presuppose that the property in question qualifies at least as one of the aforementioned five exclusive types of property in at least one of the aforementioned five exclusive industries.

repair parts for an agent's equipment but there is no agreement to sell the underlying equipment itself. *See Id.* at 202.

In the instant case there are two main issues for the Court's consideration as to whether the Repurchase Act applies. Firstly, Gates argues that the equipment contemplated by the Contract qualifies neither as the *type* of equipment contemplated by the statute nor does it fall within the *uses* contemplated by the statute. Gates argues that the products covered by the Contract consist strictly of hoses, fittings, and hoses ends for industrial applications, and these are not used in the fields of farming, construction, heavy industrial material handling, utility or lawn and garden. Gates also argues that the products which were the subject of the statue did not qualify as equipment, engines, implements, machinery or attachments. Finally, as was brought out at oral argument, according to Gates' reading of the statute, for the Act to apply Gates must also manufacture the underlying equipment in which their hoses are to be used. Gates argues that statute only covers contracts between the manufacturer of the actual equipment (such as a bulldozer, tractor, etc.) that would utilize the hoses and couplings manufactured by Gates, and a dealer in such equipment. Gates characterizes its agreement with Hydradyne as more of a "free-standing, parts-only" agreement whereby Gates does not manufacture any of the equipment to which any of its hoses may be attached for use. See Def.'s Motion, Exh. C, Rec. Doc. No. 4. Thus, under the terms of *Lake Charles Diesel*, the Repurchase Act would not apply. *See Lake Charles Diesel*, 328 F.3d at 201-202("we have determined the Repurchase Act to be inapplicable to free-standing, parts-only agreements between [manufacturers] and [distributors] that do not also sell, distribute or retail the [manufacturers'] underlying equipment, engines, implements, machinery, etc."). It is undisputed that Gates is a manufacturer of the hoses and couplings at issue.

According to Hydradyne several of their customers who bought Gates hose were construction companies, including, *inter alia*, Boh Brothers Construction, C.R. Pittman Construction Company, and Harbor Construction Company. See Plaintiff's Opp. Mem., Affidavit of Gale Helton and Accompanying Invoices, Exh. F. The evidence submitted to date supports Hydradyne's contention that the Gates' hoses sold by Hydradyne are for use in an industry (construction) that is covered by the Act. Furthermore, the Court finds that Gates' contention that for the Act to apply Gates must also manufacture the equipment in which their hoses are used to be misguided. Nowhere does the statute limit its applicability to heavy machinery or large items, and the Court finds it plausible that the Repurchase Act could just as easily apply to industrial hoses as a John Deere tractor, especially given the statutory use of *inter alia*, the terms "implements" and "attachments." Based on the record, it seems clear that Hydradyne did not merely distribute parts, repair or otherwise, for Gates; rather it sold new Gates products and "equipment" to businesses in the construction industry, while also maintaining an inventory of the products it sold. Furthermore, common sense seemingly qualifies "hose" as an "attachment" and as Hydradyne points out, "Gates itself has described [their] hose as something to be 'attached' to equipment." See Plaintiff's Opp. Mem., p. 7. Gates own marketing materials support Hydradyne's contention. See www.gates.com; see also Plaintiffs Opp. Mem. Exh. F. (". . .Gates hydraulic hoses and coupling assemblies provide fluid power to coal mining, timber harvesting, and construction equipment"). Consequently, the Court finds that Gates' hose meets the definition of the property contemplated under the Repurchase Act because its high pressure industrial hose constitutes "equipment," "implements," or "attachments" that are then used in the construction industry.

Secondly, Gates argues that the Contract runs afoul of the statutory requirement that the dealership agreement include both equipment and spare parts. Hydradyne responds with the position that the hose is the underlying equipment and that the necessary hose couplings (also stocked and sold by Hydradyne) qualify as the "spare or replacement parts" contemplated by the statute.[2]

Consequently, the Court must interpret the relevant Contract language. The Contract states that Hydradyne "will carry a representative stock" of Gates' products in order to give prompt service orders and that Hydradyne "must bring their stock up to the required minimum"(the amount of which is not stated). Furthermore while Hydradyne "may select the sizes and quantities" which will "take care of [their] service requirements," the assortment chosen "must cover a representative range of sizes adequate for [their] trade area." Although this is a close case, the Court finds that these provisions meet the requirements for coverage under the Act, including the requirement that Hydradyne maintain some sort of inventory. Specifically, it seems as if the Act applies regardless as to whether the couplings sold by Hydradyne qualify as repair (replacement) parts or the hoses themselves qualify as repair (replacement parts), since the Act itself seemingly leaves room for a product which is by nature both equipment and a repair part for such equipment. This interpretation in turn creates a Contract whereby Hydradyne would sell both Gates' hose and replacement hoses, as well as Gates couplings and replacement couplings, and, as explicitly stated in the contract, maintain of inventory ("representative stock") of both. The Court recognizes the ironies raised by such an interpretation. However, given the Louisiana legislature's intent to protect dealers in certain kinds of equipment used in specific industries from being left without a means to liquidate their

---

[2] The Court finds that because the Fifth Circuit in *Lake Charles Diesel* uses the term "spare or replacement parts" interchangeably with the term "repair parts," the terms are analogous for the purposes of statutory interpretation. *See Lake Charles Diesel*, 328 F.3d at 202.

inventories should their distributorship contracts be terminated, *see Lake Charles Diesel*, 328 F.3d at 199, as well as the opaqueness of the relevant statutory language, the Court cannot say with certainty that there exists no genuine issue of material fact in this case such that defendants are entitled to a judgment as a matter of law.  See  Fed. R. Civ. P. 56(c).

Accordingly, for reasons stated above,

**IT IS ORDERED** that defendant's Motion to For Summary Judgment (Rec. Doc. No. 4) is hereby **DENIED**.

New Orleans, Louisiana, this   20th   day of December, 2005.

_____
**STANWOOD R. DUVAL, JR.
UNITED STATES DISTRICT COURT JUDGE**